18935.   SOUTHERN RAILWAY COMPANY *v.* WOODWARD.

174

DECIDED JANUARY 22, 1929.

*McDaniel, Neely & Marshall,* for plaintiff in error.
*Clarke & Clarke,* contra.

BELL, J. Richard Woodward brought suit against Southern Railway Company under the Federal employer's liability act, to recover damages for injuries which he sustained while employed as an oiler or car-greaser in the switch-yard of the railway company at Atlanta, known as Inman yard. The plaintiff recovered a judgment, the court refused a new trial, and the defendant excepted.

Under the general grounds it is argued that as a matter of law the defendant was not negligent, but that the plaintiff's injury was due solely to his own negligence, or to a risk which he assumed. In the special grounds are assignments upon several excerpts from the court's charge.

The plaintiff was injured in a yard where there were many tracks, and where cars were being constantly shifted in making and breaking up trains, and for other purposes. The plaintiff was ordered by his foreman, with a colaborer, to go to and grease certain cars that were about to be dispatched. In obeying this order he undertook to cross a track upon which four empty cars were standing at rest, and went upon the track at a distance of eight or ten feet from them. He testified that before doing so he looked to see if any train or car was approaching, and saw none. As he

reached the middle of the track certain loaded cars were kicked against the empties from the opposite end, causing them to lurch suddenly·and rapidly forward, so that they struck and injured him.

The petition alleged, in substance, that it was customary in this yard to have the brakes applied on cars that were standing idle, so as to prevent their moving a greater distance than four or five feet when other cars were driven or kicked against them, and that the defendant was negligent in failing to observe this custom on the particular occasion. The petition may be construed as averring indirectly but inferentially that this practice was intended to promote the safety of employees other than the switching crews.

There was evidence to the effect that car-greasers and other employees, in the discharge of their duties, were frequently passing in and about the yards and over the tracks, and the jury could have found that this fact was known to the switching crew responsible for the movement which caused the injury.

This court, of course, has nothing to do with conflicts in the testimony, and, in determining whether the verdict was authorized, must view the evidence as a whole in the light most favorable to the plaintiff, although his own testimony must be construed most strongly against him.

The plaintiff was injured on Track 9. He testified: "I crossed over 9, eight or ten feet from where the cars were standing. As I crossed I looked up towards the end, towards the office. There was nothing attached, nothing coming that I could see. . . As to what is the custom when cars are left on a track in the yard, like those were left on Track No. 9, about putting on brakes and chocking them—when they leave cars it is customary to tie up the brakes. When another car hits them they don't go over four or five feet. That is the general custom out there all the time. I have observed that a good long while. I worked on the rip track, all around in the yard. When I was knocked down, that train was coming awful fast. I tried to get out of the way but could not. It did not make much fuss. The car just hit and it was right there. When I heard it hit the other, it was coming then. When the cars came together it made a fuss. When they hit the other cars they both came with a fast lurch."

The plaintiff was corroborated by another witness, W. M. Moss, who was a former employee of the railway company, and who tes-

tified as follows: "I have switched trains out there about nine years. I know the custom out there in that yard. When three or four cars are standing still, say on Track No. 9, the custom about putting on brakes or chocking the cars is to put on brakes or chock cars to keep them from rolling out. . . They tie up the brakes on standing cars they leave on No. 9. As to whether they do anything else, there are times when they chock them, yes. When you leave them and there is space of two or three car lengths south, they should be chocked to keep them from going the other way. If you hit them they roll forward, then roll back if it is on grade. If the brakes are on and they are chocked, the usual speed, the customary speed, in kicking cars in where cars are standing still is anywhere from five to ten miles. When you kick them in and cars are standing on the other track, if the cars have brakes, at five or ten miles the cars won't go but a little ways, not over three or four feet. My testimony was that they would have the brakes on on the incline and be chocked. What we term chock is a piece of wood or a railroad spike, anything, a small bolt, put under the wheel to keep it from rolling. When they are making up trains in that yard and there are left three or four cars on one track, standing there long enough to [for] a man to walk between track Number 9 and 10 and then to cross over between 8 and 9, and then get back on that track, and these cars were standing two or three car-lengths from anything on the south, and they were making up trains from the north, kicking them in from there, the custom about what they do with trains standing on track Number 9 is to set up the brakes, where they are building a train, on the first car in the track, set up the brakes to keep them from being knocked out or some employee injured working around the train. When you are building a train and have got your brakes set up tight enough to hold the cars, it is not customary to chock the cars with the brakes on, because if you set the brakes up tight enough to hold them when cars have got to be shoved, they don't chock them. As to what is the custom when the brakes are set up tight enough, and how far they ordinarily move when other cars are kicked in on them—if the brakes are set up tight enough to hold them, it is according to how fast the speed is when they hit them. At the customary speed in making up cars, they would not move anywhere if the brake was set up tight enough. Probably it would jar them a little ways, two

or three feet. If these cars had been standing a short time while making up a train on the north side, and a man undertook to cross the track south eight or ten feet behind them, and before he got across these cars moved and caught him eight or ten feet and then moved a car-length, that is not the custom in that yard. If there is a string of cars south some two car-lengths from some cars that had been standing, three or four on track No. 9, if those cars that were standing on track No. 9 two or three car-lengths from the string down south, when they were put there the ordinary and customary way was to set up the brakes on them. As to how far I would say it would knock them, if the brakes were on that car and some other cars were coming down on it—if the brakes were set up good and tight, it would have to be running pretty fast to knock them any distance at all, some three or four feet. It would have to hit pretty hard to move them that much if the brakes were very tight. There are rules and customs the way they set out there generally in making up trains. . . As to Mr. Neely asking if I chocked one end without doing anything else, and as to whether I have ever seen them do that in the yard, the first cars—no. The first cars are supposed to have the brakes on them. As to whether they chock them or put on the brakes where they are not connected with other cars two or three car-lengths away—they would chock them. When three or four cars are left on the track two or three car-lengths from cars that are standing still, the custom is to put on the brakes. As to what is the custom between cars attached to cars separated about two or three car-lengths standing still—to leave the brakes on the ones you have separated from the ones that had the brakes on when you separated. . . [The] man that was working in the field should have tied the brakes on these four cars. As to whether he should have done so if these other cars had brakes, yes."

J. B. Edwards, yard-inspector, testified that he inspected the cars after the accident, and did not find the brakes tied on these empty cars. There was other evidence from which it might have been inferred that the brakes were not on. In fact, the defendant has made no contention to the contrary in this court.

One of the witnesses who testified as to the constant presence in the yard of workmen other than the switching crews was C. J.

Conley, whose evidence was in part as follows: "Switchmen and greasers are crossing these tracks all the time. They look out for themselves though. As to whether greasers, switchmen, and all of them constantly cross tracks 8 and 9 all during the day and night, not that special track, they cross several tracks. They cross all of those tracks. As to whether I have crossed them sometimes, you have got to. It is a yard."

Will Evans, the fellow workman of the plaintiff, testified that the foreman, Mr. Kirbo, "sent both of us over there. We had to cross the tracks behind trains."

The plaintiff testified that he was supposed to look out for his own safety, and the testimony from practically every other witness was to the effect that this was true of all the employees.

■ Even though it might seem impractical and unlikely that cars standing in a busy switch-yard, and subject to be moved at any time, should have the brakes applied so as to limit their movement when struck by other cars, and although we, if sitting as triors, might be inclined to doubt that any custom of so controlling them, for the safety of employees, was ever established in this yard, yet the testimony as to the existence of such a custom or practice is in reference to facts the contrary of which a reviewing court can not know without proof, and was thus to be weighed and passed upon by the jury. The members of this court can not take judicial notice of what was done, or say as a matter of law what ought to have been done in the yards of the railway company as respects the matter of applying brakes to standing cars, under the circumstances here disclosed. The evidence for the plaintiff not being inherently improbable, the opposition thereto in the evidence for the defendant merely made a jury question.

The jury must have found that the operations were not carried on in the usual manner, and that if this had been done the cars would not have been driven far enough to strike the plaintiff some eight or ten feet away, else they would have returned a different verdict. "What ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not;" and yet "what usually is done may be evidence of what ought to be done." Texas & Pacific Ry. Co. v. Behymer, 189 U. S. 468 (23 Sup. Ct. 622, 47 L. ed. 905).

Notwithstanding a switch-yard may be a place of intense action,

where dangers are great and constantly recurring, it was the duty of the railway company, through each of its employees, to exercise reasonable care for the safety of the other employees, and in the discharge of such duty it was not only proper but necessary to have regard for the normal activities. *Atlantic Coast Line R. Co.* v. *Daniels,* 8 *Ga. App.* 775 (70 S. E. 203). True, there may have been no obligation upon any member of the switching crew to give warning or notice to the plaintiff that cars were about to be kicked against other cars on the track which the plaintiff was crossing, provided all were handled in the usual manner. But that is not the question. The defendant's main fault, if such fault existed, lay in its failure to anticipate that employees like the plaintiff might at any time be passing to and fro in the yard, so conducting themselves as to be safe in the ordinary course, but in positions of instant peril if the normal course were interrupted. In such a case there would seem strong reason why the clock should do clock work.

According to the contentions and evidence of the plaintiff, if the cars had been "tied" with the brakes in the usual manner, they would have moved not more than four or five feet, or at any rate less than the distance which he had reasonably chosen for his own safety, and he would have crossed unhurt. On the contrary, something happened out of the ordinary and he was caught unawares. Under all the facts and circumstances we can not say that the happening was not a negligent one. Until the contrary appears, an employee ordinarily has the right to assume that his employer has exercised proper care with respect to providing a safe place of work, and that his fellow servants will not be negligent toward him. Gila Valley, Globe & Northern Ry. Co. *v.* Hall, 232 U. S. 94 (34 Sup. Ct. 229, 58 L. ed. 521). "To subject an employee, without warning, to unusual dangers not normally incident to the employment, is itself an act of negligence." Chesapeake & Ohio Ry Co. *v.* Proffitt, 241 U. S. 462 (36 Sup. Ct. 620, 60 L. ed. 1102).

We fully recognize that the question of whether the defendant was negligent must be determined under the applicable principles of law as interpreted by the Federal courts, and that before a finding adverse to the railway company upon this question can be sustained, the matter must be put reasonably beyond the realm of speculation and conjecture. We think the evidence comfortably did that in this case.

The case at bar is easily distinguished from the case of Gulf, Mobile & Northern R. Co. v. Wells, 275 U. S. 455 (48 S. Ct. 151, 72 L. ed. 370), wherein the Supreme Court held that there was no evidence that the engineer knew or ought to have known that Wells, the complainant, was not on the train but was attempting to get on it after it had started, and was in a situation in which a jerk of the train would be dangerous to him. Here the members of the switching-crew, as above stated, knew or should have known that some workman in the switch-yard might be in danger at any time, should the modus operandi be changed. An established custom or practice may assume the force of a rule.

In Aerkfetz v. Humphreys, 145 U. S. 418 (12 S. Ct. 835, 36 L. ed. 758), the plaintiff had "an abundance of time" to observe the approach of the train, and there could have been no thought by the trainmen that he would pay no attention to his own safety. The cars were moving slowly along the track, the speed being about that of a man walking, and they could not have been moved "at any slower rate of speed." In that case there was nothing to show any unusual movement or handling of the cars.

In our opinion the judgment should not be reversed, either because the evidence failed to show that the defendant was negligent, or because it established as a matter of law that the defendant was not negligent, and certainly we can not say that the plaintiff's own negligence was the sole proximate cause of his injury.

■ Much that we have said above is related in a general way to the defense of assumption of risk, to which we will now advert more directly. Neither the plaintiff's testimony nor that of other witnesses to the effect that he was supposed to look out for his own safety can be taken as establishing that he assumed risks other than those which he was bound to assume under the law. While, in the absence of a special contract, he assumed without qualification all risks normally and necessarily incident to his employment, these did not include extraordinary hazards such as the negligence of his employer or of a fellow servant, with which he is not to be charged unless he had notice thereof, or unless the dangers arising therefrom were so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. *Southern Ry. Co.* v. *Wessinger, 32 Ga. App.* 551 (6), 560 (124 S. E. 100), and cases cited.

Assuming that the defendant was negligent (and this we have said the jury could have found to be true), it does not appear that the plaintiff had notice of such negligence, or that it was observable by him, in such time that he should have avoided the consequences.

In Chesapeake & Ohio Ry. Co. v. Nixon, 271 U. S. 218 (46 S. Ct. 495, 70 L. ed. 914), the employee was using a velocipede on the tracks in going to his work, and was killed through failure of the train operators to maintain a lookout while the train was in motion. The Supreme Court said: "If the accident had happened an hour later when the deceased was inspecting the track, we think that there is no doubt that he would be held to have assumed the risk, and to have understood, as he instructed his men, that he must rely on his own watchfulness and keep out of the way. The railroad company was entitled to expect that self-protection from its employees." We do not interpret this decision as holding that the railway company would have been entitled to expect self-protection from an employee as. against acts of negligence on the part of others for whose conduct it was responsible.

In Connelley v. Pennsylvania R. Co., 119 C. C. A. 392 (201 Fed. 54, 47 L. R. A. (N. S.) 867), it was held that one employed as a trackwalker takes the risk of trains operated in a proper and usual way. So in the present case the plaintiff would have assumed the risk, as a matter of law, if the cars had been operated and controlled without negligence and in the usual manner. In the Connelley case the trainmen appeared to have taken all necessary precautions for workmen in the yard, and the decedent was killed because the train suddenly emerged from a cloud of steam and fog, so that his presence was discovered too late for him or the trainmen to avoid the casualty.

In the absence of actual or presumed notice to the contrary, the plaintiff "had the right to act upon the belief that the usual method would be followed," and that the cars standing by would not be uncontrolled, but that, as was the custom, they would be held by brakes, so as to prevent their coming suddenly and violently upon him on impact from other cars. Chicago &c. Ry. Co. v. Ward, 252 U. S. 18 (4) (40 S. Ct. 275, 64 L. ed. 431).

The burden of establishing the defense of assumed risk rested upon the railway company, and before this defense may be held proved as a matter of law, the evidence introduced "to show such

assumption must be clear and uncontradicted." Chesapeake & Ohio Ry. Co. *v.* Winder, 23 Fed. (2d ed.) 794. Compare *W. & A. Railroad* v. *Hetzel,* 38 *Ga. App.* 556 (6) (144 S. E. 506). The evidence here did not measure up to this standard, and, consequently, the verdict settled that issue.

■ In one of the special grounds of the motion for a new trial the movant complained of an instruction to the jury that if they should find the plaintiff entitled to recover, they should reduce the amount of his damage to its present cash value by any correct method of calculation satisfactory to them, "using in the calculation the seven per cent. basis, that being the legal rate of interest in this State." The attack upon this charge is based upon the decision of the United States Supreme Court in the case of Chesapeake & Ohio Ry. Co. *v.* Kelley, 241 U. S. 485 (60 L ed. 1117, 36 Sup. Ct. 630, L. R. A. 1917 F, 367), wherein it was held: "The present cash value of the future benefits of which the beneficiaries were deprived by the death, making adequate allowance, according to the circumstances, for the earning power of money, is the proper measure of recovery in an action against an interstate railway carrier under the employer's liability act."

That case, so far as it goes, is, of course, controlling upon the question here presented; and it was followed by this court in *Central of Georgia Ry. Co.* v. *Goens,* 30 *Ga. App.* 770 (7) (119 S. E. 669), and in *Western & Atlantic Railroad* v. *Townsend,* 36 *Ga. App.* 70 (7) (135 S. E. 439). Under the Kelley case, supra, the legal rate of interest in Georgia could not be adopted as the fixed basis of reduction in computing the damages recoverable for the loss of future earnings or benefits, but would be simply one of the "local conditions not to be disregarded" in determining the proper result. It was thus incorrect to instruct the jury as a matter of law that this rate should be used in their calculations to ascertain the present value. We are constrained to hold, however, that the railway company was not harmed by this instruction.

According to the further reasoning of that case the standard of computation should not be such as would contemplate "the exercise of financial experience and skill in the administration of the fund," because "where this is necessarily employed the interest return is in part earned by the investor rather than by the investment." Also, it was there seemingly intimated that the interest

or income which should be obtained by a person of ordinary prudence would be the proper rate of discount, for it was said that "Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of his damages." Following this idea, this court in the *Townsend* case, supra, speaking through Jenkins, P. J., said: "It thus might seem that in order to eliminate the personality of the plaintiff in determining the amount of the damages when considered in connection with the duty to reduce the award to its present cash value, the sum awarded should be made to that fictitious person known only to the law, who is assumed to be a reasonable man exercising ordinary care and diligence."

The railway company certainly could not expect the adoption of a higher standard than that of the man of ordinary prudence; and, *assuming* this to be the proper standard, we think a rate of discount higher than 7 per cent. would be greater than a jury would be authorized to allow in cases of this sort. Very few of the States have a higher interest rate except under special contract, and it is not usual, if ever possible, to obtain a more generous return on tax-free investments. The instruction here was as to a net rate, which the court assumed to be what money should earn year in and year out, with never a loss and never an idle day, and beyond all taxes and expenses. The "fictitious person" of the law referred to by Judge Jenkins would do exceedingly well to have his money earn quite so much. If he succeeded in doing more, he should not be classed longer merely as a man of ordinary prudence, but should be ranked with those possessing skill and judgment as a financier. We hold as a matter of law that the jury, after "making adequate allowance, according to the circumstances, for the earning power of money," should not have scaled the amount of the damage more than they were instructed to do in this case.

In Louisville & Nashville R. Co. *v*. Holloway, 246 U. S. 525 (3) (62 L. ed. 867, 38 S. Ct. 379), the Federal Supreme Court, having occasion to deal again with one phase of the same question, held that the defendant railway company, in an action for death under the Federal employer's liability act, is not entitled to have the jury instructed as a matter of law that money will be worth to the widow the legal rate of interest. But this was merely to say

184

that the railway company could not demand as a matter of right a discount of as much as six per cent., and is very different from the proposition that, after being allowed a discount at the rate of seven per cent. by instructions from the court, it might reasonably have obtained more from the jury had they been permitted to pass upon the question.

In the still more recent case of Gulf &c. Ry. Co. v. Mosler, 275 U. S. 133 (72 L. ed. 200, 48 S. E. 49), it was held that in awarding damages under the Federal employer's liability act, the jury must determine the present value of the pecuniary loss, calculated as bearing interest at the highest net rate that can be had on money safely invested. But that case cited and followed the Kelley case, supra, and did not purport to change the rule laid down therein. Our conclusion in the present case is not inconsistent with what was held in the Mosler case.

While agreeing with the plaintiff in error that the charge in question was incorrect, we are yet of the opinion that it was harmless to the party complaining.

The court did not commit reversible error in any of the other instructions. There was no error in refusing a new trial.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*